**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:08cv523**

| | |
|---|---|
| **LINDA M. STEPHENS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

_____

**THIS MATTER** is before the Court on the Plaintiff's Motion for

Summary Judgment [Doc. 14] and the Defendant's Motion for Summary

Judgment [Doc. 16].

**I.      PROCEDURAL HISTORY**

The Plaintiff Linda M. Stephens filed an application for a period of

disability and disability insurance benefits, as well as supplemental security

income on February 2, 2005, alleging that she had become disabled as of

January 5, 2005  [Transcript ("T.") 64].  The Plaintiff's application was

denied initially and on reconsideration.  [T. 52-55, 45-46].  A hearing was

held before Administrative Law Judge ("ALJ") Ivar E. Avots on December

12, 2007. [T. 694-719]. On June 26, 2008, the ALJ issued a decision denying the Plaintiff benefits. [T. 11-25]. The Appeals Council denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. [T. 4-6]. The Plaintiff has exhausted all available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." <u>Smith v. Heckler</u>, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting <u>Perales</u>, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. <u>Hays</u>, 907 F.2d at 1456; <u>Lester v. Schweiker</u>, 683 F.2d 838, 841 (4th Cir. 1982).

## III.  THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process.  20 C.F.R. §§ 404.1520, 416.920.  If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied.  <u>Pass v. Chater</u>, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant.  20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment.  If the claimant does not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled.  <u>Id.</u>  Third, if the impairment meets or equals one of the listed impairments of Appendix

1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience.  Id.  Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past.  If the claimant can still perform that work, then a finding of not disabled is mandated.  Id.  Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work.  If so, then the claimant is not disabled.  Id.  In this case, the ALJ's determination was made at the fifth step.

## IV.    FACTS AS STATED IN THE RECORD

The Plaintiff was 44 years old at the time of the ALJ's hearing.  [T. 64, 694].  The Plaintiff completed the twelfth   grade.  [T. 699].

Plaintiff suffered from metastatic breast cancer.  [T. 145].  Plaintiff's Social Security application includes the interviewer's observation that she looks very tired.  [T. 71].  She reported that she was on chemotherapy and was nauseated often, had weakness and a rubbery feeling in her legs all the time, was tired all the time, and had terrible headaches, and pain.  [T. 74].  She was laid off on January 5, 2005 due to her condition including

weakness and the side effects of chemotherapy.  Id.  Her work history consisted of being co-owner of a transmission service, wherein she did repair orders and bookkeeping, for 9 years until her marital separation in August 2004 [T. 80], and work as a service porter for Anderson Automotive for 2 months prior to onset.  [T. 75].  The heaviest weight she lifted was over 100 pounds; frequent lifting reached 25 pounds.  [T. 76].  She was taking Zofran, Lorazepam and Promethazine for nausea,  and Warfarin Sodium to support the Port-a-Cath used for chemotherapy.  [T. 78]. Plaintiff listed her medications in spring 2005[1] as Lorazepam, Promethazine, Kytril and phenergan for nausea, hydrocodone for cough and congestion, and warfarin sodium.  Plaintiff experienced no energy; sickness almost all the time; and severe nausea, weakness and migraines. [T. 89].   The same medications and complaints continued as of April 27, 2005.  [T. 96].

On May 19, 2005 she reported that a good day consisted of getting the kids to school and going back to bed, a little light housework broken up with breaks, and the teenaged kids doing much of the work.  [T. 100].  She drove very little, and sometimes not at all.  [T. 101].   During the 3 to 8 days

---

[1]The form SSA 3441 is undated, but all entries therein are dated between January and April 2005.

after chemotherapy, she had to be fed fluids in bed, her kids fed her, and she could not lift more than 10 pounds with her right arm and had poor short term memory, including forgetting to take medicines. [T. 101-2]. The effects of chemotherapy minimized her driving and going outdoors. She did not shop in stores or go to public places much because her immune system was compromised. [T. 103]. Her father kept up with appointments for her, due to her memory. [T. 104]. She did not handle stress well, was depressed and feeling guilty a lot, and feared dying. [T. 106].

On June 28, 2005, she reported the same former symptoms and had the new symptom of severe bone and joint pain. Due to the removal of lymph nodes from the right side of her body, she indicated, she had been ordered not to lift more than 10 pounds for the rest of her life, to avoid severe swelling and infection in her right arm. [T. 108]. Morphine and Celebrex were new medications on her list. [T. 111].

On or after March 1, 2007, Plaintiff reported a change to her medications list; she was taking Tamoxifen, a hormone inhibitor.

Plaintiff's medical records show the following: On September 15, 2004, Dr. Johnson records Plaintiff's hysterectomy due to multiple fibroids; she was returned to work at light duty for 2 weeks. [T. 122-125, 207-211].

On December 2, 2004, a second abnormal mammogram was read.  [T. 212].  On December 7, Plaintiff initiated treatment with Dr. Pestoff for the lump in her breast and chose a surgical biopsy.  [T. 163].

It was performed on December 17, and revealed well differentiated invasive ductal carcinoma.  A lump excision was performed.  Metastasis in 1 to 3 axillary lymph nodes was found.  Grade IIA  cancer with a G1 low combined histologic grade and no residual tumor were noted.  Molecular Cytogenetic analysis for infiltrating ductal carcinoma was interpreted as normal, with no evidence of HER-2 gene amplification.  Pathology reports on the biopsied tumor showed infiltrating carcinoma, HER-2/neu indeterminate for overexpression by immunohistochemistry.  She was not to lift or strain for 48 hours.  [T. 145].

 On January 6, 2005, Plaintiff underwent right breast re-excisional biopsy, sentinel lymph node biopsy, and complete right axillary lymph node dissection.  A 1.2 cm well-differentiated, infiltrating ductal carcinoma of the right breast with close margin on the anterior was found. Plaintiff also underwent a left subclavian Port-A-Cath placement for chemotherapy.  Discharge instructions included no lifting, straining or driving for 7 days.  [T. 168-170, 185].  On January 13, Dr. Condra evaluated her for radiation oncology treatments.  Biopsy had revealed pathologic T1cN1a

well-differentiated infiltrating ductal carcinoma of the upper outer quadrant of the right breast. Plaintiff had endured much stress in the past year. She had no evidence of extensive intraductal component but did have associated low grade ductal carcinoma in situ. She did have one sentinel lymph node showing a micrometastasis measuring 1 mm, but the additional 7 lymph nodes removed did not contain metastases, and the additional margin did not have any residual carcinoma. She was separated from her husband due to a long history of domestic violence. She reported having some discomfort in the right breast since her surgery that was worse with movement, but was healing well from surgery. She was taking Percocet and Coumadin at the time, and was in no acute distress. Plaintiff was advised that Dr. Bryan would likely recommend proceeding with adjuvant systemic chemotherapy, and they would begin radiation therapy after this was completed. In a letter dated January 14, 2005, Dr. Condra reported that the claimant's cancer was found early, and she suspected that the claimant would do well. [T. 186-189].

On January 14, Plaintiff underwent initial evaluation by Dr. Bryan on referral by Dr. Pestoff for stage IIA right breast carcinoma, ER/PR positive, HER-2/neu negative, with 1 mm focus of microscopic nodal disease. This letter stated that Dr. Bryan discussed the progression of the disease and

the process of therapy. Decisions about forms of therapy were made and Dr. Bryan ordered 4 cycles of Cytoxan/Adriamycin followed by four cycles of Taxol. He stated that the claimant would undergo radiation therapy after this was completed. [T. 184, 235-7]. A whole body scan taken on January 18 was normal, showing no sign of metastatic disease to the bony skeleton. [T. 177]. A CT scan of the pneumothorax on January 20 was also normal. [T. 232]. A January 28 nurse's note of a phone call to Dr. Pestoff shows complaints of lots of vomiting and draining at the drain site. [T. 202]. An MRI of brain, taken because Plaintiff was having significant headaches, was read as normal on February 13, 2005. [T. 228].

A physical residual functional capacity assessment (RFC) was prepared on February 24, 2005 by Dr. Buchin for the State Agency. Its conclusion "suggest[ed] E3 to medium." Lifting of 50 pounds occasional, 25 pounds frequent, 6 hours stand/walk, 6 hours sitting, and unlimited push/pull were noted as exertional limitations. No other limitations at all were noted. [T. 191-198].

On February 25, Plaintiff had recently taken the second cycle of Cytoxan/Adriamycin. She had a really rough time with the first cycle, with prolonged nausea/vomiting requiring hydration at Dr. Bryan's office. She had rigors and diarrhea, and energy loss and fatigue. With the second

cycle, she was switched from Zofran to Kyrtril to avoid migraine headaches, and gave her Emend for nausea. [T. 225]. On March 18, Dr. Bryan noted that Plaintiff experienced 3-4 days of nausea with the third cycle of chemotherapy. She was confined to bed most of the time. She had significant toxicity after her March 8 chemotherapy, and was experiencing increasing fatigue. She had headaches, but walked without difficulty. Chest xrays showed no metastatic disease in the chest. Plaintiff took Emend, Kytril, and Neulasta. She had no focal bone pain or discomfort. [T. 221]. On April 18, Plaintiff was struggling with chemotherapy, but trying to keep a positive outlook. She denied problems with chest pain or arm swelling. There was no evidence of recurrent disease. [T. 200]. On May 10, Dr. Bryan noted that since starting Taxol therapy, Plaintiff had a great deal of lower extremity pain. Vicodin for this pain caused a great deal of nausea and vomiting. She had severe bone pain and discomfort for 6 days. Morphine immediate release for use during the week of Taxol treatment, and Celebrex were prescribed for pain. Fatigue was found. No adenopathy was found in any nodal region. No evaluation for edema was mentioned. [T. 340-1]. On May 31, Dr. Bryan noted the administration of Plaintiff's third Taxol/carboplantin therapy. She did much better with her bone pain with the morphine. Phenergan for

nausea precluded the need for Zofran or Kytril. She denied having any headaches, fever, chills, night sweats, cough, sputum production, unilateral weakness, numbness, or tingling. No evaluation for edema was mentioned. [T. 338-9].

On June 13, Dr. William A. Robie of DDS issued an abbreviated, one-fourth page RFC that confirmed the February 24 findings. [T. 117]. Also that date, W.W. Albertson, Ed. D. for the State Agency issued a Psychiatric Review Technique. He evaluated for affective disorders and anxiety-related disorders as defined at Listings 12.04 and 12.06, 20 CFR Part 404, Subpart P, App 1. He found depressed and anxious moods, but no severe impairments. [T. 240-252].

On June 21, Dr. Bryan evaluated her chemotherapy progress. That date was Plaintiff's last dose of Taxol. She did fairly well with her last Taxol therapy. She did have difficulty with lower extremity and bilateral hip pain, which she reported was present for approximately 4 to 5 days. She noted that the Morphine 15 mg immediate release helped that discomfort, but did not completely relieve it. She was fatigued. She had a great deal of nausea on the fourth day post-chemotherapy, but no vomiting. This lasted for about 3 days, and was not helped by the use of Kytril, which caused headaches. She had no current nausea or vomiting, or unilateral

weakness, numbness or tingling. She was taking Coumadin, morphine, Senokot and Phenergan. She was to begin radiation therapy about 3 weeks thereafter. She was having quite a bit of difficulty with hot flashes. [T. 335]. On June 27, Dr. Bryan noted that Plaintiff was taking Coumadin, Celebrex, Morphine, and MVI. She had struggled with intense and constant nausea during chemotherapy. Her right arm was swelling and uncomfortable. She was getting ready to go to the beach. [T. 266].

On September 15, 2005, a chest xray showed much improved inspiratory effort over that of January 6. [T. 681]. On September 19, Dr. Pestoff noted that she had radiation burns on her right breast, and other skin problems from radiation. She had the stressors of not working for 8 months, sick parents and two teenagers. [T. 18]. Dr. Condra's September 27 letter summarized her two months of radiation treatment saying she did very well with it. She had moderate skin erythema and no desquamation. She suffered hot flashes but did not tolerate Effexor, so she decided to take nothing. For mild lymphedema, present prior to radiation, she was fitted for a sleeve. [T. 305-6].

One month later, Dr. Condra noted that signficant fatigue and stress continued. Plaintiff had become menopausal with chemotherapy, though her hot flashes had improved. Her FSH (follicle stimulating hormone level)

was quite elevated at 79.4. She was going to remain out of work through January. She did well with her treatment. The hot flashes continued, but she still took no medications for them. Mild lymphedema was noted, and she was fitted for a sleeve. She did not qualify for studies for adjuvant hormonal therapy, but would follow up about hormonal intervention. [T. 304-7].

On October 28, 2005, Dr. Bryan evaluated Plaintiff. Plaintiff was doing well in general medically, but had the emotional stressors of a divorce and teenage children "giving her a bit of trouble." She had problems sleeping secondary to anxiety, which had led to muscle aches and pains the day after. She did have right neck and facial pain during radiation, but it resolved. She had no bone pain. She did have intermittent fatigue. All nodal regions were free of adenopathy, and no edema was found. She was instructed to have her port removed. In an addendum, Dr. Bryan noted that she needed hormone therapy; given her insufficient finances, he would see if she qualified for a study. Otherwise he would seek free sources of obtaining the Arimidex. [T. 332].

Plaintiff next saw Dr. Bryan on March 24, 2006. Plaintiff was having problems with Arimidex which was started in January 2006. After 2 hours, it made her quite fatigued and sleepy. She had continued neuropathy in

her feet and fingertips. She could pick up a pen, write, use buttons, and tie shoes without difficulty. She was then searching for a job, and had recently been on a cruise. She had no bone pain. Her hair had grown back. All regions were free of adenopathy. She had no extremity edema or lymphedema of the right upper extremity. She was instructed to take Arimidex at bedtime to control the fatigue effects. Lyrica was offered for the peripheral neuropathy, but Plaintiff declined it. She asked to be prescribed water aerobics for it instead. [T. 329-331].

Dr. Condra noted on April 11, 2006 that Plaintiff was doing well. Water aerobics was more helpful as exercise; walking four days a week had resulted in swelling in her feet. She had generalized body swelling, which Dr. Bryan had said could result from the Taxol. Mild breast edema, hyperpigmentation and fatigue were noted. Extremities were without edema. She has recovered from the acute side effects of radiation. Since she is seen by Dr. Pestoff every six months and Dr. Bryan every three months, Dr. Condra would not see her again until one year later. [T. 299-300]. On August 1, 2006, Dr. Bryan's notes indicate that Plaintiff was working full time and taking Arimidex. Bone pain from it affected her wrists, knees and elbows. Fatigue was improving. Peripheral neuropathy was neither better nor worse. She was going through a rather rough divorce,

and selling her home. Her husband pays for her medical bills and mortgage. All regions were free of adenopathy, and no edema of the extremities or lymphedema of the right upper extremity. The right breast had slight erythema and minimal dryness of the skin. She was instructed to switch from Arimidex when she runs out of it, to Femara to reduce her bone and muscle discomfort. Vitamin B6 was prescribed for peripheral neuropathy. Her chest xray was normal. [T. 325-7].

On November 28, 2006, she was still going through a divorce. Her fatigue was attributed to emotional and social stressors. Headaches did not persist, but came and went in a stress fashion. No focal motor or sensory deficits, unilateral weakness or numbness, or new areas of bone pain were noted. She continued to be fatigued. All were regions free of adenopathy. No edema in extremities. She was taking Femara. [T. 322-4].

On December 26, 2006, cancer in the form of a single 1 mm focus of low-grade invasive ductal carcinoma was found in her left breast. After further evaluation, on February 2, 2007, Plaintiff underwent a left total mastectomy, sentinel lymph node biopsy, and axillary dissection. There was no evidence of metastatic carcinoma in any lymph node. She was not to push, pull or lift over 10 pounds. She had to take a short walk at least

twice a day, rest at home, and not drive for one week. She experienced nausea throughout her hospitalization. [T. 283-289, 550, 565, 531]. On February 13, 2007, she was doing very well. [T. 274]. On May 22, 2007, Plaintiff was seen in followup. She had been switched to Tamoxifen in March or April. It caused her significant fatigue, leaving her quite tired all day. She had intermittent numbness in her right thumb and first two fingers. She was also taking Femara. She had no bone pain. Nodal regions were free of adenopathy. Her breasts had no tenderness, and her extremities, no edema. Tamoxifen was reduced to reduce her fatigue. [T. 318]. On June 22, 2007, Dr. Pestoff noted that Plaintiff had slight lymphedema in her left hand from lifting things she shouldn't have at work, but is otherwise well. She needed to be aggressive with lymph massage before her reconstruction surgery. [T. 270]. On June 26, the first stage of reconstruction was performed. [T. 254-256, 260, 394, 395, 408, 414-5]. On September 5, Dr. Pestoff noted Plaintiff was working some at this recheck, but gets tired frequently. She was supported at work in her duties. She was at high risk for recurrence, with two separate primary cancers less than two years apart. [T. 268]. In October 2007, the second stage of reconstruction surgery occurred. Dr. Conway noted that she was taking only Tylenol, being off Tamoxifen for the past two weeks due to

fatigue. [T. 477]. She was working as a cashier. No axillary adenopathy was present, and no peripheral edema of the extremities was found. Lymphedema, greater on the left, within normal limits was found. [T. 475]. She was instructed to do no lifting or straining. [T. 484].

At the hearing, Plaintiff testified about her then-current job at Ryan's. It involved all standing and walking. [T. 704]. She had been told that her lifting limitation was 10 pounds, and working too long caused swelling in her hands and arms due to removal of her lymph nodes. She worked at Ryan's from June 2006 through the time of her second cancer diagnosis in December, whereupon she worked a lighter schedule there. [T. 702]. She did not have to have radiation or chemotherapy after her mastectomy with her second bout of cancer. [T. 705]. Since the commencement of her chemotherapy in 2005, Plaintiff's short-term memory has been poor. [T. 706]. During chemotherapy she was bedridden and had to have help to get to the bathroom, other than two good days per chemotherapy cycle, from January to June 2006. [T. 101-2, 707]. Her body was so beaten down that she had to recover two months between the chemotherapy's end and the start of radiation. Id.

Plaintiff testified that she then had radiation five days per week from August through September; no records of the radiation are in the Court's

file, only a summary.  [T. 707, 305-6].  She was out of work recovering for "the rest of the months."  Her body continued to swell.  She could not walk because her feet would swell so much from the side effects.  [T. 707].  Because she is still at risk for cancer, being screened every three months, she is to avoid workplaces exposing her to airborne contaminants or fumes.  [T. 708].  She has scar tissue in her throat from nine surgeries, so swallowing pills is difficult.  Id.  The only drug she currently takes is tamoxifen to inhibit estrogen from resuming tumors.  [T. 709].  She does her best to work, because of financial need.  Her typical day currently is to work at night, from 3 to 9 or 4 to 10, and during the day she does laundry, takes a nap, and starts again.  When she was sick, her brother lived with her and took care of her children, including driving.  She does not cook, getting all their meals with her discount at Ryan's.  She gets her mother out, as her father is very ill with cancer, and visits with him.  She cannot do any lifting, so she does not assist with his care.  She takes her medications herself.  [T. 712].  She goes to church about once a month.  Her daughter helps her clean their apartment.  She goes to dinner once a week with her parents, and occasionally gets together with friends.  [T. 713].  She listens to music, watches TV and reads.  She has not done any recreational activities since she was sick, though she tried water aerobics for a short

time to reduce the swelling from chemotherapy. It enabled her to go back to work. [T. 714]. Celebrex was ineffective in reducing her swelling. Her pain had subsided. Side effects from her medication includes fatigue and aches in her joints. She naps for about an hour a day. She does not use assistive devices. [T. 715].

Plaintiff worries a lot about getting sick again. She has to be careful of her arms. Her neck swells and her hands swell, as she demonstrated to the ALJ. [T. 716]. She was able to drive part of the way to Florida for her cruise in 2005, but she had to limit her time in the sun [T. 717], and so decided to forego a separate beach trip while there. [T. 718].

## V.    THE ALJ'S DECISION

On June 26, 2008, the ALJ issued a decision denying the Plaintiff's claim. [T. 11-25]. Proceeding to the sequential evaluation, the ALJ found that the Plaintiff's date last insured (DLI) was December 31, 2008 and that she had engaged in substantial gainful activity (SGA) since her alleged onset date of January 5, 2005, which she amended to September 1, 2004 at the hearing. Specifically, the SGA took place from June 2006 to December 2006, and from a point in 2007 through the date of the hearing, with no consecutive 12 month period out of work since June 2006. [T. 13-14]. The ALJ then found that the medical evidence established bilateral

breast carcinomas, status post surgery as a severe impairment. [T. 14].

He then found that the medical evidence established depression and

anxiety to be non-severe. [T. 14]. The ALJ then determined that none of

Plaintiff's impairments met or equaled a listing. [T. 15]. The ALJ assessed

the Plaintiff's residual functional capacity, finding that she could perform the

full range of medium work, specifically including the ability to lift twenty-five

pounds frequently, fifty pounds occasionally, sit six hours, and stand/walk

six hours. [T. 15]. From these, he determined that Plaintiff was unable to

perform any past relevant work. [T. 24]. Using the grids, the ALJ

concluded that the Plaintiff could perform other work, and therefore was not

"disabled" as defined by the Social Security Act from the alleged onset date

of January 5, 2005. [T. 24-25].

## VI.  DISCUSSION

Plaintiff raises two assignments of error:  That the ALJ erred in failing

to determine a closed period of disability for claimant, and in assessing her

pain and other symptoms.  These will be addressed within a review of the

ALJ's five step sequential evaluation.

At step one, the undersigned must determine whether the claimant is

engaging in substantial gainful activity.  20 C.F.R. 404.1520(b). SGA is

defined as work activity that is both substantial and gainful. Generally, if an

individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 C.F.R. 404.1574 and 404.1575). If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience.

The ALJ noted Plaintiff's working hours and wages, as well as her earnings record, in concluding that she engaged in SGA continuously from June to December 2006, and for all but two or three months of 2007. Those provide substantial evidence supporting his decision that she was not disabled after June 2006, and that the absence of SGA prior to that date required continuing the sequential evaluation as to that earlier period.

At step 2, Plaintiff must show the existence of a medically determinable impairment, and then show it is severe. 20 C.F.R. 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "A non-severe impairment is an impairment or combination thereof that do(es) not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. 404.1521(a), 416.921(a). As the Court ruled in McCrea v. Commissioner of Social Security,

> The Commissioner's denial at step two, like one made at any other step in the sequential analysis, is to be

upheld if supported by substantial evidence on the record as a whole. Instead, we express only the common-sense position that because step two is to be rarely utilized as basis for the denial of benefits, its invocation is certain to raise a judicial eyebrow. 370 F.3d 357, 360 (3d Cir. 2004).

The ALJ discussed the evidence that an anxiety or depression-related mental impairment could exist; her denial of problems other than situational stressors, along with the PRT prepared by Dr. Albertson are substantial evidence supporting the ALJ's finding of no severe mental impairment. Plaintiff only claims one disabling impairment, breast cancer. Substantial evidence discussed infra supports the ALJ's step two finding that it was severe.

At step three, the ALJ applied the correct Listing, 13.10. It requires consideration of the following:

13.10 Breast (except sarcoma--13.04). (See 13.00K4.)

A. Locally advanced carcinoma (inflammatory carcinoma, tumor of any size with direct extension to the chest wall or skin, tumor of any size with metastases to the ipsilateral internal mammary nodes).

OR

B. Carcinoma with metastases to the supraclavicular or infraclavicular nodes, to 10 or more axillary nodes, or with distant metastases.

OR

C. Recurrent carcinoma, except local recurrence that remits with antineoplastic therapy.

20 CFR Part 404, Subpart P, App 1 §13.10.

The ALJ evaluated Plaintiff's cancer under sections A and C of the Listing, but not under section B. No explanation was given for this omission. Potentially this omission was due to section 13.00K(4), which indicates that metachronous bilateral breast cancer is not treated as recurrence, but as one occurrence of the same primary disease. 20 C.F.R. Part 404, Subpart P, App 1, 13.00K(4). Plaintiff's condition, however, presented with the metachronous occurrence and also micrometastasis into one node. [T. 235]. Thus, it was error for the ALJ to fail to evaluate Plaintiff's condition under Section B. The question then arises whether that error was prejudicial, or as Plaintiff seems to indicate, whether the Listing should have been evaluated through the assistance of a medical expert.

Metastasis in breast cancer can meet Section B of the Listing in any of three ways: metastasis into 10 or more axillary nodes, metastasis into the supraclavicular or infraclavicular nodes, or as distant metastases. Plaintiff's disease, however, did not advance so as to meet any of these criteria, as indicated in her Data Form for Cancer Staging: Breast. [T. 135-138]. The metastasis was into an axillary node, not a supraclavicular

23

or infraclavicular node.  [T. 136].  The disease only moved into one axillary

node.  [T. 136, 235]  No distant metastasis was involved.  [T. 137].

The Data Forms are clear and unequivocal on these points, so there

would have been no reason for the ALJ to incur the expense of a medical

expert for the evaluation of Plaintiff's condition under Listing 13.10B.  That

clarity also renders the ALJ's failure to discuss Plaintiff's condition under

Listing 13.10B to be harmless error; discussion still would have resulted in

a finding that Plaintiff's condition did not meet the Listing.   An error that

had no practical effect on the outcome of the case is not cause for

reversing the Commissioner's decision.  DeWalt v. Astrue, Slip Copy, 2009

WL 5125208 (D.S.C.,2009), citing Benskin v. Bowen, 830 F.2d 878, 883

(8th Cir.1987).

At step four, the ALJ performed an RFC assessment.  RFC is an

assessment of an individual's ability to do sustained work-related physical

and mental activities in a work setting on a regular and continuing basis.

SSR 96-8p at *1.  The RFC assessment considers only functional

limitations and restrictions that result from an individual's medically

determinable impairment or combination of impairments, including the

impact of any related symptoms.  Id.  The RFC assessment must first

identify the individual's functional limitations or restrictions and assess his

or her work-related abilities on a function-by-function basis... . Id. RFC is

not the least an individual can do despite his or her limitations or

restrictions, but the most. Id.

> Assessing the credibility of a claimant's symptoms of
> pain is a two-step process. . . First, a claimant must
> establish, by objective medical evidence, 'the
> existence of a medical impairment(s) which results
> from anatomical, physiological, or psychological
> abnormalities and which could reasonably be
> expected to produce the pain or other symptoms
> alleged. ... If a claimant meets this burden, the ALJ
> must then evaluate the manner in which the intensity
> and persistence of these symptoms affect the
> claimant's ability to work.... Craig v. Chater, 76 F.3d
> 585, 594-5 (4th Cir. 1996) (internal citations omitted);
> SSR 96-7p.

"Because he had the opportunity to observe the demeanor and to

determine the credibility of the claimant, the ALJ's observations concerning

these questions are to be given great weight." Shively v. Heckler, 739 F.2d

987, 989 (4th Cir. 1984).

The determination of the ALJ not to designate a closed period of

disability implicates the ALJ's RFC assessment for the period prior to June

2006. As that is the date on which she resumed substantial gainful activity

and as such could not qualify for benefits, limitations displaying her RFC

would have to be demonstrated as existing for a 12 month period prior to

that date.

Plaintiff has the burden of proof to provide evidence of her residual functional capacity. 42 U.S.C. (d)(5)(A).

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Id.

The evidence Plaintiff proferred on this issue clearly indicates, through her subjective complaints and through medical records, that she incurred intermittent limitations from pain, fatigue, swelling, headaches, and other side effects of medications and treatment for her cancer impairment. While the earliest diagnosed conditions of record were her hysterectomy in September 2004 and the breast cancer diagnosis in December 2004, and while the ALJ correctly evaluated the breast cancer as a severe impairment satisfying the first prong of the Craig test, neither Plaintiff nor the records indicate that the diagnoses themselves caused limitations that need

assessment in establishing her RFC.  The diagnoses were tied to surgical interventions that led to only short-term limitations during her recoveries therefrom.  [T. 122, 125, 129-131, 136-7, 139, 168-170, 185].

It was the medications and treatment that caused the limitations that would establish her RFC, and those did not begin until some unspecified date after January 18 but before February 24, 2005.  [T. 202, 225].  Once Plaintiff began her four rounds of chemotherapy, she experienced constant nausea, some vomiting, pain requiring Morphine that included bone and joint pain, significant fatigue, swelling, and the onset of menopause with its side effects such as hot flashes.  [T. 200, 221, 225, 231, 299-300, 318, 332, 304-7, 340-1, 338-9, 335, 266, 329-331, 326-7, 477].  She had a few good days in each chemotherapy cycle but was otherwise bedridden, once having to be taken to her doctor's office for rehydration after a period of severe vomiting.  [T. 707, 225].  The chemotherapy ended in June 2005. [T. 335].

Plaintiff underwent radiation during August and September 2005.  No records of the radiation itself are found in the administrative transcript; only a summary.  [T. 305-306].  So it is less clear what, if any, unique side effects came from radiation, other than one mention of a burn and minor skin problems.  Id.

Plaintiff's hearing testimony about the severity of symptoms from the side effects of the treatment suggests that their intensity continued unabated through the date of the hearing; that is, her testimony does not specify any time period in which their intensity diminished. Unchanged consistency over a 3-year period, of symptoms from 6 months of cancer treatment, is not consistent with common experience, the medical records, or her periodic written update forms submitted to SSA during 2005. One of the medical records with which this testimony is inconsistent is that of Dr. Condra on October 27, 2005, who indicated that she was recovered from the acute side effects of radiation therapy; that her hot flashes had improved; and that she was without bone pain, abdominal pain, arm edema. [T. 304-7]. Plaintiff chose to take no medication for her hot flashes. [T. 306]. Plaintiff arranged her medical appointments in the final two months of the year around her cruise schedule. [T. 305, 333]. She testified about her cruise and the only limitation she mentioned pertained to sun exposure and the strain of driving to Florida. [T. 717]. After that date, records show fewer of the side effects in any one encounter visit, she attributes more as situational, and their severity is reported as less and/or improved with medication. Plaintiff initiated water aerobics in March or April 2006, and she testified that it allowed her to return to work. [T.

299-300, 329-331, 314].   The ALJ's conclusion about the credibility of Plaintiff's subjective evidence of pain and other symptoms, based on its inconsistency with the record, is supported by substantial evidence and followed applicable standards.

No medical record states any limitation on Plaintiff's movements or activities.  Plaintiff's claim that she has a lifelong limitation to 10 pounds lifting is not supported by the record.  [T. 108, 702].  The first RFC performed by the State Agency, stating an RFC for medium work, was performed only 22 days after she applied, when the treatments and their side effects were just beginning.  [T. 191-8].  But that RFC was confirmed by the state agency in June, around the time that chemotherapy, which produced the worst side effects, was ending.  [T. 117].

Sometime around January 2006 she began hormone inhibition therapy via various drugs that she testified caused significant fatigue.  [T. 332, 329-331].  Medical records show that fatigue sometimes improved, that it was attributable to situational stressors within the home, and that Plaintiff would at other times stop the medicine to avoid the fatigue.  [T. 326-7, 322-4, 318, 257-9].

Plaintiff seems to argue that the ALJ had a duty to develop the record on her RFC by consulting a medical expert to explain her functional

limitations.  The Court disagrees; nothing medically complex appears that complicates the RFC issue sufficient to take it outside the ALJ's qualifications to evaluate.  What is missing is clear evidence that Plaintiff was more limited in the physical and mental work functions than the state agency found in its February and June 2005 assessments.  It was Plaintiff's burden to produce such evidence.  Further, Plaintiff had the opportunity before and during the hearing, and on the current Motion for Summary Judgment, to specify what questions were left unanswered and required medical expert testimony, but did not do so.    Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...." 42 U.S.C. §423(d)(1)(A).  Substantial evidence suggests that the most severe limitations that Plaintiff experienced allowed her an RFC of medium work, and only lasted from late January 2005 to late October 2005, a period of less than 12 months.  Thus the ALJ's declining to find a closed period of disability was proper.

Plaintiff does not complain of the ALJ's step four determination that she could not perform her past work, or of his step five determination that

there are jobs in the national economy that a younger individual with a high school education and an RFC for the full range of medium work can do. The Court finds no error in these conclusions.

## VII.  CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied the correct legal standards, and that there is substantial evidence to support the ALJ's finding of no disability from the date of onset to the date of his decision.

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 14] is **DENIED**; the Defendant's Motion for Judgment on the Pleadings [Doc. 16] is **GRANTED**; and the Commissioner's decision is hereby **AFFIRMED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE**, and judgment shall issue simultaneously herewith.

**IT IS SO ORDERED.**

Signed: July 1, 2010

Martin Reidinger
United States District Judge